## SPANN v. SOUTHERN LIFE AND HEALTH INSURANCE CO.

### No. 75-500-CC.

County Court, Palm Beach County.

March 2, 1976.

Murray Klein, West Palm Beach, for the plaintiff.

John W. Thornton, Miami, for the defendant.

DANIEL T. K. HURLEY, Judge.

This cause came on for trial before the court and from the evidence and testimony adduced therein, the court makes the following —

#### FINDINGS OF FACT

1. On December 2, 1974, Angelo F. Aloia, a soliciting agent for defendant, Southern Life and Health Insurance Company, met with Rufus Carson for the purpose of completing an application for an industrial whole life insurance policy.

2. On December 2, 1974, Carson was active and in apparent good health. Nonetheless, and unbeknown to him, he was afflicted with hepatic cirrhosis which resulted from chronic alcoholism.

3. On the policy application Carson answered in the affirmative the question whether he was then in good health and free from all disease. He answered in the negative the question, "Have you ever suffered from . . . alcoholism?"

4. Defendant's agent could have required Carson to undergo a physical examination prior to the issuance of the policy. Based on his observations of Carson and considering the amount of the policy, the soliciting agent elected not to require a physical examination. Where an examination is not conducted, the company charges a higher premium which further reduces the risk.

5. Carson named the plaintiff, Verzel Spann, as the beneficiary of the policy.

6. The application was submitted to the home office of the defendant insurance company and was approved. Policy No. 13323297 was issued by Southern Life and Health Insurance Company on December 9, 1974, and Carson commenced paying the premiums thereon.

7. On December 9, 1974, the date of the issuance of the policy, Carson was active and in apparent good health. Nonetheless and unbeknown to him, he was afflicted with hepatic cirrhosis due to chronic alcoholism.

8. On February 24, 1975, the insured, Rufus Carson, died at the Veterans Administration Hospital in Miami, Florida. The cause of death was "hepatic cirrhosis and encephalopathy due to chronic alcoholism." (Plaintiff's Exhibit No. 1.)

9. The terms of the policy provide that defendant upon receipt of proof of death of the insured would pay the sum of $2,000 to the designated beneficiary.

10. Policy No. 13323297 was in full force and effect on the 24th day of February, 1975.

11. Plaintiff in this case has furnished the defendant proof of the insured's death as required by the terms of the policy.

12. Defendant has failed and refused to pay the amount of money stipulated in the policy.

13. A reasonable attorney's fee for the plaintiff is $2,000.

Based on the foregoing findings of fact, the court reaches the following —

## CONCLUSIONS OF LAW

### I

#### MATERIAL MISREPRESENTATIONS

Defendant insurance company has based its denial of benefits in this case on two separate, independent grounds. The first is that the policy issued to Rufus Carson was induced by material misrepresentations made by Carson, viz. (1) that he was in good health, and (2) that he had never suffered from alcoholism. The company claims that both of these statements were false, that this information was material to acceptance of the risk assumed by Southern Life, and that the policy was issued in reliance upon the misrepresentations made by the insured.

The company cites Florida Statute 627.409 and the case of *Life Insurance Company of Virginia v. Shifflet*, 201 So.2d 715, 719 (Fla. 1967) for the proposition that a misrepresentation which is material to the acceptance of the risk will vitiate the policy irrespective of whether it is an innocent mistake or whether it is made with fraudulent intent — "We hold misrepresentations in an application for insurance, material to the acceptance of the risk, do not have to be made with knowledge of the incorrectness and untruth to vitiate the policy."

The plaintiff responds to this contention by suggesting that the rigid *Shifflet* standard set forth above has been repudiated by the Florida Supreme Court in *National Standard Life Insurance Company v. Permenter*, 204 So. 2d 206 (Fla. 1967). There the court per curian discharged a writ for lack of jurisdiction. In a separate concurring opinion, however, with which a majority of the court agreed, Justice Ervin took the opportunity to state his views regarding the *Shifflet* decision. After expressing concern that the "pronouncement in *Shifflet* may be too sweeping in scope and might lend itself to application where literally to do so would work injustice," Justice Ervin said —

> "An incorrect statement in order to be material and vitiate a policy must be one by the insured in response to a question he understood or should reasonably have understood, or one which reasonably he could be expected to have sufficient information to answer or state he lacks knowledge to give a responsive answer." ***

> "Each siutation where an alleged misrepresentation or incorrect statement is advanced to vitiate a policy should be examined to determine whether under the particular circumstances the applicant reasonably could be held responsible for the incorrect statement and without fault on the part of the insurer."

The specific question of whether the Florida Supreme Court had narrowed its ruling in *Shifflet* was answered by the United States Court of Appeals for the Fifth Circuit in *Hyman v. Life Insurance Company of North America,* 481 F.2d 441, 444 (1973), where the court said, "The time has now come to answer that question, and we answer it affirmatively." Florida courts have reached the same conclusion. See *Travelers Insurance Company v. Zimmerman,* 309 So.2d 569 (3d Fla. App. 1975).

In this case the evidence shows that the decedent, Rufus Carson, did not have any medical knowledge of his latent poor health. There was no evidence of prior consultations, hospital visits or examinations. Indeed, Carson had no suspicion of ill health. He had maintained steady employment requiring taxing manual labor. His friends regarded him as well and healthy and for that matter, so did defendant's soliciting agent who visited with Carson on at least five different occasions prior to the issuance of the policy.

Set against this factual background, it would seem that the agent's questions and Carson's responses are the very kind of inquiry Mr. Justice Ervin had in mind when he wrote in *Permenter,* supra, at page 207 —

> "Think, for example, of the numerous situations in which an applicant is asked by the insurer or its agent to respond to questions which require, or call for in one way or another, statements that amount to matters of opinion or judgment. In such cases where an applicant responds to such questions, many times posed in series, his answers made in good faith and without intent to deceive should not automatically in all cases have the effect of voiding the policy should one or more turn out to be an erroneous experession of opinion or judgment. In the area of health, an applicant may express an erroneous opinion concerning a specific question relating to his health of which he has no medical knowledge and which could only be answered by a medical expert after diagnosis or examination."

Measuring Rufus Carson's responses against the *Permenter* standard, I concluded that they were not material to the acceptance of the risk and that they are not sufficient to vitiate the policy.

## II
### SOUND HEALTH AT ISSUANCE

The defendant insurance company's second ground for denial of benefits is that on December 9, 1974, the date of the issuance of the policy, Rufus Carson was afflicted with hepatic cirrhosis due to chronic alcoholism and was therefore not in "sound health."

This defense springs from clause #7 of the policy which states — "Effective Date — This policy shall take effect on the policy date, provided the Insured is then alive and in sound health . . ."

It is the defendant's position that the "sound health" required by this clause is a warranty or a condition precedent, and hence the decisive matter is Carson's actual state of health on December 9, 1974, and not his opinion or belief that he was in good health — the defendant contends it is immaterial that he did not know that he was in fact not in good health.

Clearly this is the crucial issue in this case for the court has already found as a fact that Carson was not in sound health on December 9, 1974, and that he did not know nor had any reason to know that he was not in sound health. There is substantial and persuasive legal authority to support the defendant's position. *Gulf Life Insurance Co. v. Green,* 80 So.2d 321 (Fla. 1955) ; *Winte v. Gulf Life Insurance Co.* (No. 2), 12 Fla. Supp. 114 (Cir. Ct., Dade, 1958). See also *American National Insurance Co. v. Herrera,* 27 Cal.Rptr. 641 (4th Cal.App. 1963) ; *Huffman v. State Capital Life Insurance Co.,* 174 S.E.2d 17 (N.C.App. 1970) ; and 30 A.L.R. 3d 389.

The question of how alleged misrepresentations by an an insured are to be interpreted is inextricably linked to the question of how a "sound health" clause is to be interpreted. Both inquiries aim at the same target. They intersect and reinforce each other. The Supreme Court's analysis of one — alleged misrepresentations in *Permenter* — has a direct bearing on the other. In *Permenter* the court rejected an "absolute blanket-type approach" which may be "too sweeping in scope and might lend itself to application where literally to do so would work injustice." The court found that it was unfair to penalize an insured and rescind the policy unless the insured knew or had reason to know that his statements were incorrect. Underlying this decision is the policy that it is simply unfair to lead a person to believe that he is insured and then allow a rescission of the policy on the ground that it is not to be interpreted in a manner in which the insured might reasonably have interpreted it. The insured cannot be placed in a position of status quo ante. It is too late then for him to seek other insurance. This same focus should apply to a "sound health" clause.

All of the case authorities cited in support of defendant's position are pre-*Permenter*. But if, as seems reasonable, we look to *Permenter* for guidance on how to approach and frame the proper definition of "sound health," it should be construed to mean "apparent and a reasonably sound health without any knowledge, or reason to know, on the part of the applicant to the contrary."

This standard is consistent with the court's holding in *Gulf Life Insurance Company v. Green,* supra, upon which the defendant has principally relied. In *Green* the insured died of complications from rheumatic heart disease — a disease for which she had received treatment on three occasions prior to the issuance of the policy.

In the case at bar, Carson was unaware that he was suffering from a fatal disease on December 9, 1974, and he had no reason to suspect the existence of that condition. All of the testimony, and his own actions, substantiate the proposition that he believed he was in sound health. Indeed, the insurance company's soliciting agent testified that he had the authority to require a physical examination by the insured but elected not to do so. Rather, he testified that the company reduced its risk by charging a higher premium when the insured was not required to undergo a physical examination.

Utilizing the above definition of "sound health" and applying it to the facts of this case, the court concludes that Rufus Carson met the requirements of this clause on December 9, 1974, the date of the issuance of the policy. See *Sharp v. Richmond Life Insurance Company,* 183 S.E.2d 132 (Va. Sup.Ct. 1971), 30 A.L.R.3d 389, 401, §4 and *Gulf Life Insurance Company v. Shelton,* 21 So.2d 39 (Fla. 1945).

It is therefore ordered and adjudged that the plaintiff, Verzel Spann, shall take and recover judgment from the defendant, Southern Life and Health Insurance Company, in the amount of $2,000, plus $2,000 as and for a reasonable attorney's fee, plus $18 court costs, for all of which let execution issue.